**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| **KOBELCO CONSTRUCTION MACHINERY CO., LTD. and KOBELCO CONSTRUCTION MACHINERY U.S.A. INC.,** | ) | |
| | ) | **Court No. 26-03741** |
| **Plaintiffs,** | ) | **NONCONFIDENTIAL** |
| **v.** | ) | Business Proprietary Information Removed from Pages 5-12 and 14-16. |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

1. Plaintiffs Kobelco Construction Machinery Co., Ltd. and Kobelco Construction Machinery U.S.A. Inc. (collectively, "Plaintiffs" or "Kobelco"), by and through their attorneys, allege and state as follows:

## JURISDICTION

2. Plaintiffs bring this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B)(i) to contest the final affirmative material injury determinations issued by the U.S. International Trade Commission ("Commission") in the antidumping duty investigation of lattice-boom crawler cranes ("LBCCs") from Japan. *See Lattice-Boom Crawler Cranes (LBCCs) From Japan; Determination*, 91 Fed. Reg. 45,282 (July 20, 2026) ("Final Determination"). The determinations, findings, and conclusions are set out primarily in the Commission's accompanying publication. *See* Lattice-Boom Crawler Cranes (LBCCs) from Japan, Inv. No. 731-TA-1742, USITC Pub. 5764 (July 2026) (Final).

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) because this action is commenced pursuant to 19 U.S.C. § 1516a.

**STANDING**

4. Plaintiffs are a foreign producer and exporter and an importer of subject merchandise and are therefore interested parties within the meaning of 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3), and 28 U.S.C. § 2631(k)(1).

5. Plaintiffs participated, through the submission of both factual information and legal argumentation, in the investigation that gave rise to the contested Final Determination. Plaintiffs were therefore "part{ies} to the proceeding" and are entitled to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF THIS ACTION**

6. On July 20, 2026, the Commission published in the *Federal Register* the Final Determination. 91 Fed. Reg. 45,282.

7. The U.S. Department of Commerce ("Commerce") published the antidumping duty order on Lattice Boom Crawler Cranes from Japan on July 23, 2026. *Lattice Boom Crawler Cranes From Japan: Antidumping Duty Order,* 91 Fed. Reg. 46,396 (July 23, 2026).

8. Plaintiffs timely filed the Summons on August 24, 2026, and this Complaint is filed within 30 days of the filing of the Summons, pursuant to 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c), and Rules 3(a)(2) and 6(a) of the Rules of this Court.

**PROCEDURAL HISTORY**

9. On April 10, 2025, The Manitowoc Company, Inc. ("Manitowoc") filed a petition with the Commission and Commerce alleging imports of LBCCs from Japan were sold in the United States at less than fair value and those imports materially injure or threaten material

injury to a domestic industry. *See Lattice-Boom Crawler Cranes, Whether Or Not Assembled, from Japan: Antidumping Petition* (Apr. 10, 2025).

10. On April 10, 2025, the Commission instituted an investigation to determine whether there was a reasonable indication that an industry in the United States was materially injured or threatened with material injury, or the establishment of an industry in the United States was materially retarded, by reason of imports of LBCCs from Japan that were alleged to be sold in the United States at less than fair value. *See Lattice-Boom Crawler Cranes (LBCCs) From Japan; Institution of Antidumping Duty Investigation and Scheduling of Preliminary Phase Investigation*, 90 Fed. Reg. 15,989 (Apr. 16, 2025). Respondent entities that participated in the investigation included Kobelco and Link-Belt Cranes, L.P., LLP ("Link-Belt"), which imports LBCC assemblies from Japan used in the production of complete LBCCs in the United States, and its affiliated Japanese producer, Sumitomo Heavy Industries Construction Cranes Co., Ltd. ("Sumitomo").

11. On May 27, 2025, the Commission preliminarily determined that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of LBCCs from Japan. *See Lattice-Boom Crawler Cranes (LBCCs) From Japan*, 90 Fed. Reg. 23,364 (June 2, 2025).

12. On February 11, 2026, the Commission published a notice in the Federal Register, scheduling the final phase of its antidumping duty investigation. *See Lattice-Boom Crawler Cranes (LBCCs) From Japan; Scheduling of the Final Phase of Antidumping Duty Investigation*, 91 Fed. Reg. 6,265 (Feb. 11, 2026). Plaintiffs responded to the Commission's questionnaires on April 8, 2026, and submitted revised questionnaire responses on April 13, 2026. Plaintiffs submitted a prehearing brief on May 28, 2026, gave testimony at the Commission's June 3, 2026

hearing, and filed a posthearing brief on June 10, 2026. Plaintiffs submitted final comments on June 29, 2026.

13. On July 2, 2026, the Commission voted affirmatively, finding that that an industry in the United States was materially injured by reason of imports of LBCCs from Japan, and it published notice of its determinations on July 20, 2026. *See Lattice-Boom Crawler Cranes (LBCCs) From Japan; Determination*, 91 Fed. Reg. 45,282 (July 20, 2026). This Complaint concerns the Commission's findings articulated in its Confidential Final Views. *See* Views of the Commission, Inv. No. 731-1742, EDIS Document No. 888790-2588705(July 20, 2026) (Final) ("*Confidential Final Views*").

14. On July 23, 2026, Commerce published the antidumping duty order. *See Lattice Boom Crawler Cranes From Japan: Antidumping Duty Order*, 91 Fed. Reg. 46,396 (July 23, 2026).

## SUMMARY OF OPINION

15. When making its final determination of material injury by reason of subject imports, the Commission excluded Link-Belt from its definition of the domestic industry. *See Confidential Final Views* at 18. The Commission concluded that the record indicated that Link-Belt's primary interest was in "importation rather than domestic production," stating that it is "reliant on subject imports for substantial LBCC components, manufacturing only the lattice boom, hoist, and jib assemblies, and the live masts in the United States." *Id.* at 16-17. Moreover, the Commission found that Link-Belt's "domestic production operations have substantially benefited from its importation of subject assemblies," claiming that Link-Belt benefited from lower input costs that, if Link-Belt was included in the domestic industry, would "skew data in a way that would mask injury to the industry." *Id.* at 17-18. For these reasons, the

Commission defined the domestic industry "to include domestic producers of in-scope assemblies and LBCCs other than Link-Belt." *Id.* at 18.

16. In its material injury analysis, the Commission considered the volume effects, price effects, and impact of subject imports. With regard to volume, the Commission found that the overall volume of subject imports decreased by **[ ]** percent from 2023 to 2025. *Id.* at 37; Lattice-Boom Crawler Cranes (LBCCs) from Japan; Inv. No. 731-TA-1742 (Final) Staff Report, Memorandum INV-YY-089, EDIS Document No. 885603-2565470 (June 18, 2026), as revised by Investigation No. 731-TA-1742 (Final): Lattice-Boom Crawler Cranes (LBCCs) from Japan – Revision to the Staff Report, Memorandum INV-YY-097, EDIS Document No. 886187-2572236 (June 25, 2025), ("Confidential Final Staff Report") at Tables 4.2, 4.3. The Commission observed that subject import market share increased by **[ ]** percentage points over the Period of Investigation ("POI"), and the ratio of subject imports to U.S. production of LBCCs "decreased by **[ ]** percentage points from **[ ]** percent in 2023 to **[ ]** percent in 2024 and by an additional **[ ]** percentage points to **[ ]** percent in 2025." *Confidential Final Views* at 37; Confidential Final Staff Report at Tables 4.2, 4.3. Based on these findings, the Commission concluded that the volume of subject imports was significant in both absolute terms and relative to U.S. consumption and production. *Confidential Final Views* at 38.

17. With regard to price effects, the Commission concluded that "subject imports significantly undersold the domestic like product and suppressed prices for the domestic like product to a significant degree." *Id.* at 48. As part of its price effects analysis, the Commission collected total quantity and f.o.b. value data on sales of three pricing products shipped by U.S. producers and importers to unrelated U.S. customers during the POI. *Id.* at 39. The Commission only considered pricing data from U.S. producer Manitowoc and Kobelco, and it found that the

pricing data reported by these firms "accounted for approximately **[ ]** percent of the domestic industry's U.S. shipments of LBCCs and **[ ]** percent of U.S. commercial shipments of subject imports from Kobelco in 2025." *Id*. Despite the low coverage, the Commission afforded undue weight to the underselling data, finding that the pricing data showed that Kobelco undersold Manitowoc's product in 10 quarterly comparisons involving sales of **[ ]** units of subject merchandise. *Id*. The Commission acknowledged that the comparisons "cover a relatively low proportion (**[ ]** percent) of U.S. commercial shipments of subject imports from Kobelco in 2025," but it stated that the data "show subject imports priced below the domestic like product in all available quarterly comparisons" and stated that "other evidence on the record corroborates that Kobelco's LBCCs are offered at prices that are lower than the prices for the domestic like product." *Id.* at 39-40.

18. The Commission pointed to average-unit value ("AUV") data provided in Kobelco's posthearing brief, stating that the AUV data "show Kobelco's values beneath Manitowoc's for each year of the POI for complete LBCCs with load capacities of 130 to 199 short ton max load capacity, 200 to 279 short ton max load capacity, and 280 to 359 short ton max load capacity." *Id.*at 40. Chairman Johanson did not join this conclusion, stating that he did "not view AUV comparisons to be probative of relative prices in this market given the wide range of capacity sizes, even within a given segment, and the variety of attachments and configurations which can result in widely different AUVs." *Id.*at 40, n.180.

19. The Commission acknowledged that it also received total quantity and f.o.b. value data for U.S. sales of the three pricing products from Link-Belt. *Id.* at 41. However, despite excluding Link-Belt from the domestic industry, the Commission declined to analyze Kobelco's and Link-Belt's pricing data cumulatively, basing its decision on the conclusory statement that

"{c}omplete LBCCs from Link-Belt only enter the U.S. market as mixed U.S. and Japanese origin product and are thus not sales of exclusively subject imports. Indeed, Link-Belt asserts that its domestic production operations add substantial value to its LBCCs." *Id.* at 41 n.183. Accordingly, the Commission separately considered Link-Belt's pricing data because "Link-Belt's completed LBCCs are produced from both imported and domestically produced assemblies." *Id.* at 41. The Commission acknowledged that Link-Belt's pricing data showed that Link-Belt's completed LBCCs were priced higher than the domestic like product in **[ ]**, or **[ ]** of **[ ]**, quarterly comparisons. *Id.* at 41-42.

20. For "other record evidence" to support that imports are priced lower than the domestic like product, the Commission stated that "purchaser questionnaire responses show purchasers reporting subject imports being priced lower than the domestic like product." *Id.* at 43. Some purchasers reported that Kobelco was a price leader and usually offered the lowest prices, and "Manitowoc and several of its affiliated dealer/distributors also attested to facing lower prices from subject imports." *Id.* at 43-44. The Commission afforded "little weight" to lost sales allegations, because "most purchasers responding to the lost sales/revenue portion of the questionnaire are dealer/distributors with affiliations or supply arrangements with a particular producer or importers or LBCCs," meaning that "purchasers do not purchase LBCCs from varying sources based on price," instead "compet{ing} with the domestic like product in this market downstream of the transaction between producers and their dealer/distributor purchaser." *Id.* at 44 n.196. The Commission acknowledged that, "{o}f the 19 responding purchasers, 16 reported that they had not purchased subject imports instead of the domestic like product while three reported that they had," though none of the three reported that subject imports were priced lower than the domestic like product. *Id.*

21. With regard to its price depression and price suppression analysis, the Commission found that prices uniformly increased throughout the POI. *See id.* at 44-45. The Commission also acknowledged that Manitowoc had a "favorable price-cost improvement during the POI, with its prices generally increasing and its net sales AUV having overall greater increases than its unit {Cost of Goods Sold ("COGS")}," meaning that its COGS-to-net sales ratio declined over the POI. *See Id.* at 45. However, the Commission still found price suppression because, during the POI, Manitowoc's prices "were always **[ ]** to cover its costs," and "{t}he high ratios of COGS to net sales, and thereby Manitowoc's **[ ]**, persisted throughout the POI" despite "favorable demand conditions that, absent some opposing force, should have enabled Manitowoc's position to more meaningfully improve." *Id.* at 45-46. Moreover, despite finding that prices uniformly increased over the POI, the Commission found that "subject imports forced Manitowoc to lower prices (either reducing established prices or retreating from increased prices) and exerted downward pricing pressure on Manitowoc, through its affiliated distributor dealers." *Id.* at 46.

22. In particular, the Commission pointed to three purchasers (**[ ]** of which were **[ ]**), which reported that Manitowoc reduced prices in order to compete with lower-priced subject imports and also found that "purchaser responses to Commission questionnaires show additional examples of subject imports exerting downward pressure on prices for the domestic like product." *Id.* at 46-47. The Commission found that "{t}he inability of Manitowoc's distributors/dealers to sell Manitowoc's LBCCs due to competition from low-priced subject imports can directly impact Manitowoc's production, sales, and revenues" and that "low-priced subject imports forced Manitowoc to refrain from needed price increases in order to achieve competitive prices for its distributors/dealers who sell

Manitowoc's LBCCs to rental companies/end users in competition with low-priced subject imports." *Id.* at 47-48.

23. The Commission also found that subject imports had a significant impact on the domestic industry. As observed above, the Commission treated only Manitowoc as a domestic producer, excluding Link-Belt from its analysis. *See id.* at 18. When examining output-related indicators of Manitowoc, the Commission acknowledged general improvement over the POI, including an increase in practical capacity (by **[ ]** percent), production (by **[ ]** percent), and shipments (by **[ ]** percent), along with a **[ ]** percentage-point decline in capacity utilization and **[ ]** percentage point decline in overall market share. *Id.* at 49. The Commission also found that the domestic industry's employment-related indicators improved over the POI, including an **[ ]** percent increase in the number of production and related workers, a **[ ]** percent increase in the number of hours worked, a **[ ]** percent increase in wages paid, and a **[ ]** percent increase in worker productivity. *Id.* at 50.

24. Likewise, the Commission observed that the domestic industry's financial performance generally improved over the POI, though Manitowoc remained **[ ]**. *Id.* Specifically, gross profits increased, as did operating income and net income as a ratio to net sales. *See id.* at 50-51. Based on these data, along with its findings that "a significant volume of subject imports significantly undersold the domestic like product and suppressed prices for the domestic like product to a significant degree," the Commission concluded that, "despite substantially increased demand and increases in the domestic industry's production, U.S. shipments, and revenues, the domestic industry's revenues were lower than what they otherwise would have been, contributing to the industry's **[ ]** to cover its costs and its poor financial performance that persisted throughout the POI." *Id.* at 51.

25. The Commission dismissed record evidence showing that Kobelco had virtually no presence in the market in 2022, yet Manitowoc experienced **[ ]**, demonstrating that subject imports did not injure the domestic industry. *See id.*; *see also* Kobelco's Posthearing Brief, Inv. No. 731-TA-1742, EDIS Document No. 884793-2561327 (June 10, 2026) (Final) ("Kobelco Posthearing Br."), App'x I at 10-11. Specifically, the Commission stated that the record "indicate{d} that demand was softer and raw material costs were higher in 2022 than during the 2023-2025 POI, which would adversely affect the domestic industry's financial performance in 2022." *Confidential Final Views* at 51. The Commission also found that, given the lead times associated with LBCC production, "prices for many if not most of Manitowoc's shipments in 2022 necessarily were set prior to 2022" and "many of Kobelco's purchaser/customers waited for Kobelco to return to the market in 2023 and 2024 instead of sourcing from alternative suppliers, like Manitowoc," so there was "no reason to believe that Kobelco's reduced presence in the U.S. market in 2022 would have altered its effect on Manitowoc's pricing, and thereby its financial performance, that year." *Id.* at 52.

26. In a footnote, the Commission also dismissed Plaintiffs' arguments that non-price factors drive sales in the U.S. market, suggesting a lack of negative price effects, because "{t}he record indicates that price was an important purchasing factor for customers of distributors/dealers, who accounted for the vast majority of the domestic industry's and U.S. importers' U.S. shipments during the POI." *Id.* at 52 n. 239.

27. The Commission also dismissed arguments that the stark differences in Manitowoc's and Link-Belt's financial performance suggest that subject imports cannot be the cause of Manitowoc's poor financial performance. *See id.* at 53-54. The Commission concluded that Link-Belt's relative profitability "corroborate{d} the low pricing of subject imports in the

U.S. market and the significant effects of that pricing on domestic prices as Link-Belt's use of subject imports in its production of LBCC{s} contributed to its relatively lower production costs and greater profitability despite the downward pricing pressure exerted by subject imports." *Id.* at 54. Specifically, according to the Commission, "Link-Belt benefited substantially from its reliance on subject imports that constituted a majority, **[ ]** percent, of the total value of its inputs in finished LBCCs," which the Commission found was a significant cost advantage compared to Manitowoc, which imported components that accounted for **[ ]** percent of its raw material costs. *Id.*

28. The Commission also declined to find that other factors may have impacted the domestic industry. With regard to nonsubject imports, which accounted for **[ ]** of apparent U.S. consumption, by quantity, the Commission concluded that "the large majority of nonsubject imports were imported by Liebherr from Austria and Germany," "record evidence does not indicate that Liebherr was a low-priced source of supply to the market," and "the presence of nonsubject imports from Austria and Germany declined over the POI." *Id.* at 54-55. The Commission acknowledged record evidence showing that nonsubject imports from China were priced lower than domestically produced LBCCs but found that "nonsubject imports from China were a much smaller presence in the market than subject imports from Japan," despite **[ ]** market share over the POI (from **[ ]** percent in 2023 to **[ ]** percent in 2025). *Id.* at 55.

**<u>STATEMENT OF CLAIMS</u>**

29. In the following respects, and for other reasons apparent from the administrative record of the Commission's investigations of LBCCs from Japan, the Final Determination is

unsupported by substantial evidence and otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

**COUNT ONE**

30. Paragraphs 1 through 29 are hereby incorporated by reference.

31. The Commission's decision to exclude Link-Belt from the domestic industry was unsupported by substantial evidence and otherwise not in accordance with law. Contrary to the Commission's findings, record evidence showed that Link-Belt is primarily interested in maintaining and growing U.S. domestic production activities.

**COUNT TWO**

32. Paragraphs 1 through 31 are hereby incorporated by reference.

33. The Commission's determination that "the volume of subject imports is significant, in absolute terms and relative to U.S. consumption and production," and the related findings stemming from this conclusion, are unsupported by substantial evidence and otherwise not in accordance with law. *See Confidential Final Views* at 38.

**COUNT THREE**

34. Paragraphs 1 through 33 are hereby incorporated by reference.

35. The Commission's determination that subject imports significantly undersold the domestic like product was unlawful and unsupported by substantial evidence on the record.

36. Among other errors, the Commission rested its underselling decision on the extremely limited pricing data of Kobelco, which accounted for **[ ]** percent of Kobelco's shipments in 2025 and did not provide sufficient coverage to make a thorough analysis of prices. *See* Confidential Final Staff Report at 5.6 (Table C.1).

37. The Commission placed undue weight on the limited pricing data on the record by not accounting for extensive customization available to customers that could have meaningful price differences even within the relatively narrow pricing product definitions. *See* Kobelco Posthearing Br. at 7.

38. The Commission also failed to explain adequately why underselling with such a small shift in market share was significant. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("{W}hile {an agency's} explanations do not have to be perfect, the path of {the agency's} decision must be reasonably discernable."); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (holding that there must be a "'rational connection between the facts found and the choice made.'")).

39. Finally, the Commission ignored substantial record evidence demonstrating that subject imports were not low priced notwithstanding the small volume of undersold imports by Kobelco.

**COUNT FOUR**

40. Paragraphs 1 through 39 are hereby incorporated by reference.

41. The Commission's decision not to combine pricing data of Kobelco and Link-Belt was unsupported by substantial evidence and otherwise not in accordance with law.

42. The Commission expressly declined to treat Link-Belt as a domestic producer in part because "{s}ubject imports account for the majority of the value of its completed LBCCs," and it "could not sell complete LBCCs without its subject imports." *Confidential Final Views* at 17. However, the Commission used the opposite reasoning when declining to combine the pricing data of Kobelco and Link-Belt and when affording Link-Belt's pricing data "less weight

than the other record evidence," citing Link-Belt's assertion that "its domestic production operations add substantial value to its LBCCs." *Id.* at 41-42, *id.* n.183.

43. By dismissing Link-Belt's pricing data and failing to combine it with Kobelco's pricing data consistent with its normal practice, the Commission did not adequately support its finding of significant underselling of the domestic like product by subject imports. *See id.* at 44. Specifically, the Commission failed to account for predominant overselling and failed to explain how its findings on price suppression were not undermined by the prevalence of overselling in the combined pricing data.

**COUNT FIVE**

44. Paragraphs 1 through 43 are hereby incorporated by reference.

45. The Commission's determination that subject imports suppressed prices for the domestic like product was unlawful and unsupported by substantial evidence.

46. Among other errors, the Commission failed to acknowledge that neither import volume, subject market share, price, nor domestic profit trends correlated to changes in Manitowoc's COGS/sales ratio. In fact, record evidence showed that Manitowoc's COGS/sales ratio was the **[ ]** of the POI when subject imports were at their **[ ]** in 2024. *See* Confidential Final Staff Report at Table C.1.

47. Moreover, the Commission concluded that "subject imports forced Manitowoc to lower price (either reducing established prices or retreating from increased prices)," a finding that directly contradicted record evidence and its own assessment that domestic prices uniformly increased over the POI. *See Confidential Final Views* at 45-46. The Commission did not acknowledge that, with regard to lost sales/lost revenues, <u>no</u> purchasers reported that subject

imports were lower priced than domestic product, including firms that purchased from both domestic and subject sources. *See* Confidential Final Staff Report at 5.17.

**COUNT SIX**

48. Paragraphs 1 through 47 are hereby incorporated by reference.

49. The Commission's determination that subject imports had a significant adverse impact on the domestic industry was unlawful and unsupported by substantial evidence on the record.

50. Among its errors, the Commission ignored substantial record evidence that severed the causal link between subject imports and domestic industry performance. In particular, the Commission did not acknowledge that, based on record evidence, there was no correlation in time between the various injury factors and subject import volume, market share, and pricing trends.

51. Moreover, the Commission unreasonably dismissed the "natural experiment" in 2022, during which Kobelco was virtually absent from the market, yet the domestic industry performed **[ ]** than **[ ]** of the POI. The Commission stated that 2022 was not a "natural experiment" because "the record indicates that demand was softer and raw material costs were higher in 2022 than during the 2023-2025 POI," and "prices for many if not most of Manitowoc's shipments in 2022 necessarily were set prior to 2022." *Confidential Final Views* at 51-52. However, record evidence does not support these conclusions, and Commission did not address contradictory evidence when dismissing the relevance of 2022 data.

52. Additionally, even if the Commission relied on its flawed underselling analysis, it should have acknowledged that the magnitude of underselling of **[ ]** of subject

imports was **[**

**]**, suggesting that subject imports were not the cause of material injury.

53. Moreover, in a footnote, the Commission dismissed that non-price factors drove sales in the U.S. market, ignoring substantial record evidence showing that customers made purchasing decisions based primarily on non-price purchasing factors like quality.

54. Finally, the Commission did not give sufficient weight to other possible causes of injury to the domestic industry, including nonsubject imports and other tariffs that affected Manitowoc's raw material costs.

**DEMAND FOR JUDGMENT AND RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

55. Hold that the portions of the Commission's Final Determination described herein are not supported by substantial evidence on the record and are otherwise not in accordance with law;

56. Remand this matter for the Commission to issue a determination consistent with the final opinion and order of this Court; and

57. Provide such further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Daniel M. Witkowski
Sydney L. Stringer
Sung Un K. Kim
Sarah P. Tinaphong

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4347
ymcnamara@akingump.com

*Counsel to Kobelco Construction Machinery Co., Ltd. and Kobelco Construction Machinery U.S.A. Inc.*

Dated: September 23, 2026